# EXHIBIT C



20 Fenchurch Street,
London EC3M 3AU

*** WITHOUT PREJUDICE ***

3rd April 2019

*Via Email and Certified Mail*

Greg Skorheim
Claims Resolution Services, LLC
3808 109th Ave. SE
Snohomish, WA 98290
Email: greg.skorheim@comcast.net

    Re:    **Vintage Wine Estates – wildfire smoke-taint claim**
            Named Assured:    Leslie G. Rudd Living Trust
            Policy No.:           B1262SM0419217
            Claim No.:            RSA Claim No. I224490

Dear Mr. Skorheim:

        We write to provide our coverage response to the claim you submitted on behalf of Vintage Wine Estates ("VWE") for 48 lots of smoke-tainted wine made with grapes that were exposed to smoke on the vine during the October 2017 Napa/Sonoma wildfires. The claim was submitted to subscribing underwriters under Marine Stock Throughput Insurance Policy No. B1262SM0419217 (1 October 2017 to 1 October 2018). This coverage response is provided on behalf of all subscribing underwriters ("underwriters") to the above-referenced policy.

        This letter does not respond to the claim for the 5 additional "in-process" lots which were added to the claim in January 2019, as we have not yet received 3D Marine's investigation report for those 5 lots. We will respond separately with respect to these 5 lots in due course.

I.    **Summary of Basis for Coverage Response**

        Underwriters have engaged in a detailed investigation of VWE's claim. The length of the investigation has been dictated by VWE's claim that all of the grapes used to make the wines included in this claim were "free of smoke damage" when received by VWE, despite the fact that all of the grapes were harvested well after the wildfires commenced from vineyards in the immediate vicinity of the wildfires and smoke clouds. Notwithstanding the evidence of smoke exposure to the grapes on the vine, VWE contends that the smoke exposure to its wines occurred while the wines were under process at VWE's facilities.

www.rsagroup.com

RSA Insurance Group plc.
Registered in England and Wales No. 2339826.Registered Office 20 Fenchurch Street, London EC3M 3AU.

Greg Skorheim
**VWE Wildfire smoke-taint claim**
3rd April 2019
Page 2

In addition to our independent investigation through 3D Marine and consultation with industry experts, we have considered all of the evidence and information provided by VWE with respect to the original 48 lots of wine. The evidence currently available to underwriters indicates that the subject wines were damaged as a result of the grapes being exposed to smoke while on the vine. Consultation with experts and industry publications has confirmed that even a short period of smoke exposure to grapes on the vine damages the grapes, resulting in smoke taint. The extended periods of smoke exposure to which these grapes were subjected while still on the vine, especially during the heaviest smoke exposure period (which was generally during the first 3 days and up to the first 7 days of the fires), far exceed the exposure periods known to cause damage to grapes while on the vine.

We disagree with your assessment that the grapes exposed to extended periods of smoke while on the vine were free of smoke damage when harvested. To the contrary, we conclude that the grapes had been damaged by smoke exposure before harvest. While no evidence has been presented showing any relevant exposure to smoke during processing, if there had been some additional exposure during processing, the grapes were nevertheless already damaged before the policy attached and any additional exposure, if demonstrated, would not have changed the fact that the grapes were already smoke damaged. The biological process by which grapes absorb the smoke indicates that this process occurs while the grapes are on the vine

As we previously advised VWE in our letters of 5 July 2018 and 28 August 2018, the Marine Stock Throughput policy does not cover damage arising from smoke exposure to the grapes on the vine. Damage caused to the grapes on the vine can only be covered by a crop insurance policy, and we understand that VWE had crop insurance for the 2017 crop grown at its Mitsuko estate vineyard, but not for its other estate vineyards. We also understand that VWE did not make a claim under that crop insurance policy. If you disagree with the coverage response set forth in this letter, please provide a copy of the crop insurance policy and all correspondence between VWE (including its broker and any claim representatives) and the crop insurer(s) relating to the 2017 wildfires.

It is VWE's burden to establish that its claim falls within the Marine Stock Throughput policy's coverage, which attaches to grapes upon harvest at the earliest, depending upon the circumstances. In January 2019, 3D Marine interviewed two of VWE's winemakers, both of whom stated that they tasted grapes in the vineyards during the fires and did not taste any smoke-taint or other quality concerns. The winemakers' alleged tasting of some of the grapes during the fires (which has not been corroborated by any evidence to show the dates of attendance or the vineyards attended) does not establish, as VWE claims, that the grapes were "free of smoke damage" when VWE received them at the relevant facilities.

First, it cannot reasonably be disputed that the subject grapes were in fact exposed to significant smoke while on the vine (before harvest) and that the grapes absorbed the smoke at that time. Second, it is our understanding that smoke-taint may not be detectable in grapes simply by tasting the grapes. As such, we do not see the winemaker's statements and/or personal

Greg Skorheim
**VWE Wildfire smoke-taint claim**
3rd April 2019
Page 3

beliefs as establishing that the relevant smoke exposure actually occurred after the grapes or wine were under process at the facilities, particularly in light of the evidence that all of the grapes were subjected to smoke on the vine for extended periods for at least 3 days and up to 19 days in some cases.

We believe that we have now exhausted our investigation as to the original 48 lots included in this claim. For the reasons explained in more detail below, underwriters decline VWE's claim for smoke-taint to the 48 lots of wines made with grapes that were exposed to smoke on the vine.

However, we invite VWE to come forward with any new/additional evidence or information that it believes indicates that the smoke exposure/damage occurred during processing rather than on the vine. If VWE provides new information, we will be happy to reconsider our coverage response.

II.     **Factual Background and Underwriters' Investigation**

VWE asked its brokers to place underwriters on notice of a potential "stock" claim arising out of the wildfires on 15 January 2018. When asked by the brokers to identify the locations where the possible "stock" damage occurred, VWE's Karen Diepholz stated: "Our Applebone, BRCohn estate, Mitsuko & Julianna *vineyard harvests* are at risk of smoke taint." (14 Feb. 2018 email from K. Diepholz to D. Schwind (emphasis added)). Samuel Montgomery (U.S. broker) forwarded the emails from VWE to Simon Mauduit (U.K. broker) on 1 March 2018, and thereafter Mr. Mauduit forwarded the emails to underwriters.

A.     **3D Marine's Investigation**

Underwriters assigned Joanne Gillespie of 3D Marine to gather necessary information and investigate the claim on 15 March 2018. 3D Marine made various attempts to obtain information regarding the claim from the brokers and VWE, but VWE did not provide any substantive information regarding the nature of its claim until early June 2018, just prior to Ms. Gillespie's site visits on 5-6 June 2018. During the site visits, Ms. Gillespie learned that a significant portion of the wine was made with grapes that were harvested after the wildfires commenced. Ms. Gillespie advised you by email dated 6 June 2018 of her understanding that the policy does not provide coverage for smoke exposure to the grapes on the vine.

Following the site visits, VWE provided its VWE PRELIMINARY 2017 Fire Impact Report ("Preliminary Report") dated 18 June 2018, which is a spreadsheet providing various pieces of data regarding the 48 batches of wine included in the claim. Based on the "Actual pick dates" column of VWE's Preliminary Report, it came to our attention that all 48 batches of wine were made using grapes with "Actual pick dates" of between 3 days and 19 days after the wildfires commenced. In order to confirm the actual pick dates for the grapes, 3D Marine requested the weight tags for the grapes used to make all of the lots included in this claim.

Greg Skorheim
**VWE Wildfire smoke-taint claim**
3rd April 2019
Page 4

On 5 July 2018, underwriters issued a reservation of rights letter to VWE, advising VWE that there is no coverage to the extent that the wines included in this claim were made using grapes that were exposed to smoke on the vine. On 12 July 2018, you sent a letter to underwriters disputing various issues raised in our 5 July reservation of rights letter. In particular, you asserted that "[a]ll grapes used to make these wines were free of defect at the time of acceptance from the various vineyards." (12 July 2018 Letter from G. Skorheim to G. Justice (underlining added)). Your 12 July letter further asserted that "[t]he insured's wine was damaged in the process of making the wine during the wildfires and the resulting intense smoke, with grapes that were free of defect prior to processing." *Id.* (underlining added).

On or about 10 July 2018, Tom Eddy (underwriter's winemaker consultant) visited the relevant VWE facilities and took samples of the 48 lots of wine included in this claim, plus 10 control samples selected by VWE from the 2016 vintage, for taste-testing and laboratory testing. We understand that Tom Eddy performed his taste-testing within two days of taking the samples. On 15 August 2018, 3D Marine provided you with a copy of Tom Eddy's Tasting and Analysis Summary, which finds that as of Tom Eddy's tasting on or about 11-12 July 2018, 4 batches had extreme smoke taint, 25 batches had smoke taint, 11 batches had "possible/ marginal" smoke taint, and 6 batches showed no tastes or flavours of smoke taint.[1]

Tom Eddy also sent one sample of each batch to ETS Laboratories (which tests for "free" guaiacol, 4-methylguaiacol) and one sample of each batch to Vinquiry Laboratories (which tests for "total" guaiacol, 4-methylguaiacol) to test for smoke taint markers. Both labs ran their tests in mid-July 2018. The Vinquiry lab test results generally show elevated levels of "total" guaiacol and 4-methylguaiacol). The ETS lab test results show lower levels of "free" guaiacol and 4-methylguaiacol. It is our understanding that the "total" and "free" guaiacol and 4-methylguaiacol levels do not necessarily establish that the sample is smoke-tainted, but they are considered "markers" of potential smoke taint.

On or about 8 August 2018, VWE provided the weight tags (although it subsequently was determined that a few were still missing). Upon review and analysis of the weight tags, it became apparent that all of the subject wines were made solely with grapes harvested after the wildfires commenced. In emails to Joanne Gillespie dated 30 July and 10 August 2018, you confirmed that the 48 lots of wine were made solely with grapes harvested after the fires began.

On 21 August 2018, VWE provided the addresses for the vineyards from which the grapes used to make the subject wines were harvested. Underwriters obtained an analysis of the locations of each vineyard and each of the relevant winery facilities in relation to the locations of the three main fires and the direction of movement of wind and the smoke clouds. The purpose of obtaining these smoke exposure analyses was to find out whether and to what extent the relevant vineyards had been subjected to smoke prior to the respective harvest dates of the grapes, and whether the winery facilities experienced significant smoke exposure levels on or after the respective dates when the grapes arrived there for processing.

---

[1] We note that Tom Eddy's report indicates that 16 of the batches he tasted show no signs of smoke taint, but that 10 of those batches are the "control" samples from the 2016 vintage, and are not included in this claim.

The smoke exposure analyses confirm that all of the vineyards were subjected to smoke, particularly in the first 3 to 7 days of the fires, during which period the subject grapes were still growing on the vine. The analyses also confirmed that the smoke exposure levels at the Clos Pegase and Girard facilities reduced to low levels by 14 October 2018 (Clos Pegase) and 16 October 2018 (Girard). The vast majority of the grapes used to make the subject 48 lots of wine did not arrive at the relevant facilities until after these dates.

Since your letter of 12 July 2018, VWE has maintained that the subject grapes were "free of smoke damage" when VWE accepted them, and that the smoke exposure damage actually occurred while the wines were under process at the relevant facilities. After numerous email exchanges between October and December 2018 between you and 3D Marine, it was agreed that Joanne Gillespie of 3D Marine would interview VWE's winemakers from the Clos Pegase and Girard facilities, which took place in early January 2019.

Both Robin Akhurst (Clos Pegase winemaker) and Glenn Hugo (Girard winemaker) stated that they continued to visit vineyards to taste grapes (and possibly take samples for chemical analysis) that had not yet been harvested when the fires broke out. However, neither winemaker was able to recall which vineyards he visited when, nor even whether they definitely visited each of the vineyards to taste grapes while the fires were ongoing.

Mr. Akhurst stated that he uses an app to track his mileage and inputs the task related to each trip, but the mileage information provided to us after the interview only shows that Mr. Akhurst claimed mileage on a few dates during the fires, but does not show what tasks he performed on those dates (e.g., visited vineyard x). Mr. Hugo stated that there is no way to confirm which vineyards he visited on which dates.

Mr. Akhurst confirmed that there was smoke at each of the vineyards at some point, but it varied depending on the day. He remembers "mild to moderate" smoke in the Rutherford vineyard (estate vineyard), and he said "one was aware of the smoke." He said that he could smell smoke. He recalled that the smoke conditions at the Applebone vineyard (estate vineyard adjacent to Clos Pegase facility) was <u>at its worst during the first 3 days of the fires</u>. He could not recall the conditions at Mitsuko (estate vineyard), but he stated that the smoke conditions at the third party vineyards would be similar to those at Rutherford due to geographical similarities. He said he wore a face mask some of the time, depending on conditions.

Mr. Akhurst stated that he was concerned during the fires that the grapes which had not yet been harvested may have smoke taint problems. He stated that he was having discussions with other winemakers (unidentified) at the time regarding what the effects of smoke on the grapes on the vine might be, and how to approach the smoke taint problem. He stated that he expected to taste smoke in the grapes that had been exposed to smoke on the vine, but was "surprised" to find that they did not taste smoky. On that basis, he stated that he believed the grapes were "not defective when harvested."

Greg Skorheim
**VWE Wildfire smoke-taint claim**
3rd April 2019
Page 6

      Mr. Hugo stated that he does not keep any records of his vineyard visits or his tasting of the grapes at the vineyards, and he also does not normally take samples of grapes for chemical analysis, as he likes to rely primarily on tasting to determine when the grapes are ripe and ready for picking. He stated that he continued to visit the vineyards that had not been harvested yet after the fires broke out, and that he continued to taste the grapes as normal for ripeness and quality issues. He considered smoke to be a quality issue, and stated that if he had tasted a problem with smoke, he would have advised either Marty Peterson or Marco DiGiulio. When asked if he could reject grapes for smoke damage, he did not know, but Marty Peterson confirmed that (as to third-party vineyards) "legally we had to pick the grapes – there was no smoke rejection right."

      Mr. Hugo had prior experience with smoke taint from the 2008 Mendocino fires, during which one lot (made by a third party) came to Girard for them to monitor what the effect of smoke exposure to the grapes on the vine was on the finished wine. Despite this prior experience with smoke taint, Mr. Hugo claims that he did not suspect that the grapes that were still on the vine after the fires commenced might be smoke damaged and produce smoke-tainted wine. Mr. Hugo said that he assumed that if the unharvested grapes were damaged by smoke exposure, he would have tasted the smoke taint when he tasted the grapes in the vineyards, but he admitted that he does not know if it is possible to taste smoke in a grape that has been exposed to smoke.

      During Mr. Hugo's interview, VWE's Marty Peterson advised that VWE had crop insurance for its estate vineyards, and that VWE's options with respect to its estate grapes that it knows were exposed to smoke on the vine are to either make a claim under the crop insurance policy, or switch those grapes to another program and/or process and bottle them under a different lower-priced label. VWE has since confirmed that it only purchased crop insurance for the 2017 crop grown at the Mitsuko estate vineyard, and it did not make a claim on the crop policy relating to the 2017 wildfires.

### B. The Scientific Evidence

      In order to understand the way in which smoke particles enter grapes and/or wine, underwriters consulted with a scientific expert specialising in research in the fields of wine and wine grapes' chemistry, biology, and physiology. Based on those consultations, the biological uptake of smoke particles into the grape occurs as follows: The smoke particles settle on the skin of the grape, and the free Volatile Phenols ("VPs") (such as guaiacol, 4-methylguaiacol, syringol, and m-, o-, p-cresols) which are contained in the smoke particles seep through the grape's waxy skin into the grape's tissue relatively quickly (as quickly as 30 minutes, according to numerous articles published on the internet prior to and during the 2017 wildfires). The physical damage to the grapes occurs at the time the free VPs enter the grape tissue, because they cannot thereafter be removed, and it is these VPs which cause the ashy/smoky flavours associated with smoke-tainted wine.

      Once the free VPs are inside the grape tissue, the grapes' own molecules see the free VPs as "toxins" which the grapes' cells want to neutralize and sequester. Hence, the grapes' cells

Greg Skorheim
**VWE Wildfire smoke-taint claim**
3rd April 2019
Page 7

attach sugar molecules to the free VPs, creating "glycosylated phenols" or "glycosides."[2] These glycosides stay sequestered in the grapes' molecular structure, until they are later released in various ways (including contact with yeasts or enzymes). When released from the sugars, some of the VPs may be detectable by the human palate as ashy flavours or odours if they are present in elevated numbers.

We understand from our consultations with the wine science expert, as well as our review of numerous scientific and wine industry articles available online (many of which were published before or during the first week of the 2017 wildfires), that the prevailing understanding is that smoke-taint to wine is caused by smoke exposure to grapes on the vine. We have not seen any articles, research, or references to smoke exposure during processing of wine that has been shown to cause smoke taint. Further, we understand that wine that is under process is protected from any smoke in the environment by the $CO_2$ gas that is released as a byproduct during fermentation and/or by gases that are pumped into the tanks/barrels during ageing.

### III. Coverage Analysis

#### A. The Marine Stock Throughput Policy Does Not Cover Damage Caused by Smoke Exposure to the Grapes on the Vine

As the name of the policy indicates, the Marine Stock Throughput Policy is intended to cover VWE's "stock" whilst in transit, in storage, or in process. It does not cover damage caused by smoke exposure to grapes on the vine. Grapes on the vine are not "stock," but rather, are a growing crop. The Marine Stock Throughput Policy is not intended to, and cannot, provide crop insurance covering damage to the grapes on the vine.

Crop insurance is federally regulated, and only approved domestic insurance providers are allowed to provide crop insurance, which is available for selected crops, including wine grapes. The U.S.D.A Risk Management Agency's (RMA) website lists the approved crop insurance providers (https://www3.rma.usda.gov/tools/agents/companies/2017/californiaCI.cfm). The RMA website also provides the approved wording for each type of crop policy, including wine grapes grown in California (https://www.rma.usda.gov/policies/2010/10-0053.pdf).

We recently learned that VWE had crop insurance for some of its estate-owned grapes. We understand that VWE has not made a claim against its crop insurance arising out of the 2017 wildfires. If VWE disagrees with our coverage response in this letter, we request that VWE provide any correspondence between VWE (including its brokers and claims representatives) and its crop insurers regarding the 2017 crops affected by the wildfires, as well as a copy of the relevant crop insurance policy.

The Stock Throughput Policy's coverage attaches to grapes at the earliest upon harvest (but may attach to some grapes later, depending on the circumstances), and covers VWE's

---

[2] Due to the fact that the grape cells attach sugar molecules to the free VPs, it is apparently not normally possible to taste the smoke taint in the grape itself.

Greg Skorheim
**VWE Wildfire smoke-taint claim**
3rd April 2019
Page 8

"stock" (harvested grapes or wines) whilst in transit, or in storage/process. The policy's Interest Clause provides in relevant part:

> "<u>INTEREST</u>:   On goods and/or merchandise of every description consisting principally of, but not limited to case wine, bulk wine, bottled wine, grapes, barrels, packaging and/or all other interests including raw materials and semi-finished goods handled by the Insured in the course of their business and/or in the care, custody and control of the Insured whether in transit (including domestic and internal transits) or store or elsewhere anywhere in the World – shipped in and/or over . . . ."

*See* Marine Stock Throughput Policy, page 2 of 32.

Per the Interest Clause, the interest or subject matter insured is defined as goods and/or merchandise "handled by the Insured in the course of their business and/or in the care, custody and control of the Insured whether in transit . . . or store . . ." The policy also extends coverage for harvested grapes and/or wine while the goods are being processed or manufactured, except where the loss or damage is "solely caused by such process." *See* Marine Stock Throughput Policy, page 15 of 32. Grapes on the vine are not being physically manipulated (handled) by the Insured for transit, storage, or processing, and are therefore not included in the interest insured.

In addition, the policy's Basis of Valuation and Loss Settlement Clause only provides a basis of valuation for (1) Bottled Winery Products/Irreplaceable Bulk Wine; (2) Replaceable Bulk Wine; or (3) Non Wine Products (such as Barrels). *See* Marine Stock Throughput Policy, page 3 of 32. Grapes on the vine do not fall within any of those categories.

### B.   <mark>The Marine Stock Throughput Policy Does Not Cover Smoke-Taint to Wines Made with Grapes Exposed to Smoke on the Vine</mark>

Based on VWE's Preliminary Report showing the "Actual pick date" for each batch of wine, and the weight tags provided by VWE, it cannot be reasonably disputed that the original 48 lots of wine included in VWE's claim were made solely with grapes harvested between 3 days and 19 days after the wildfires commenced and significantly exposed to smoke from those fires for extended periods of time. Nonetheless, VWE asserts that all of these grapes were "free of smoke damage" when VWE received them, and contends that the wines made with those grapes were damaged by smoke during processing at VWE's facilities. We simply cannot find evidence to support that position, and it is contrary to the abundant evidence of smoke exposure before harvest.

The subject grapes remained on the vine for a minimum of 3 days, and the smoke exposure analyses obtained by underwriters, which are corroborated by Robin Akhurst's interview, confirm that the smoke levels at most vineyard locations were the highest during the

Greg Skorheim
**VWE Wildfire smoke-taint claim**
3rd April 2019
Page 9

first 3 days of the fires (although some locations had high levels for the first 7 days). The smoke levels at the Clos Pegase facility decreased to "low" by 14 October, and at Girard by 16 October.

This evidence demonstrates that the vast majority of the grapes were not received at the relevant facilities (and therefore not placed under process) until well after the smoke levels had decreased to low. The same grapes experienced a correspondingly longer and extended period of smoke exposure in the vineyards. For example, grapes that were harvested on 20 October were exposed to smoke on the vine for 12 days (the first 3 to 7 of which were the highest levels), and the smoke levels at the relevant facility had already diminished to low several days before those grapes arrived at the facility for processing. Since the evidence indicates that the grapes on the vine suffered physical damage caused by smoke exposure in the vineyards, which necessarily occurred before the Marine Stock Throughput Policy attached, there is no coverage for the resulting smoke taint to the wine made with those smoke-exposed grapes.

The Stock Throughput Policy's coverage grant provides coverage "[a]gainst all risks of physical loss of or damage to the subject-matter insured from any external cause." *See* Policy, page 3 of 32. The evidence indicates that the smoke taint to the 48 lots of wine originally included in VWE's claim was caused by the fact that the grapes had already been physically damaged by smoke exposure on the vine. Because the smoke-exposure damage occurred while the grapes were still a growing crop in the vineyards, which was prior to the policy's attachment and prior to the commencement of VWE's processing of the grapes into wine, there was no "external cause" of damage to the wines that occurred during transit, storage or processing. Thus, the claim does not fall within the policy's transit or storage/processing coverage.

Since the current evidence strongly indicates that all of the grapes used by VWE to make its wine were smoke-exposed while still on the vine, the damage had already occurred at the time the policy's coverage attached. Even if an actual and relevant exposure to smoke could be shown to have occurred during processing, which has not been demonstrated, the loss was already in progress when the policy attached upon harvest (at the earliest) of the already exposed and damaged grapes. Regarding in-process exposure, if any, the policy's "Process" clause may also apply to preclude coverage to the extent that VWE's processing of the smoke-exposed grapes caused damage to the wine, but we do not currently see any evidence to suggest such a cause.

### IV. Conclusion

We have now exhausted our investigation, which establishes that the grapes were not "free of smoke damage" as you have asserted and that the smoke-exposure damage occurred while the subject grapes were still on the vine. Therefore, we must decline VWE's claim based on the current evidence. However, we invite VWE to provide any new or additional evidence or information which it believes may affect our coverage response. If new information is provided, we will of course reconsider our coverage response in due course.

Greg Skorheim
**VWE Wildfire smoke-taint claim**
3rd April 2019
Page 10

    As previously mentioned, we will provide a separate coverage response with respect the 5 in-process lots of wine added to the claim in January 2019 once 3D Marine has provided us with its investigation report.

    This letter is written solely on the basis of the information presently available to underwriters, and is not to be construed as a waiver of any rights, limitations, exclusions, or defenses under the policy or at law. All rights, limitations, exclusions, and defenses of underwriters, whether set forth in this letter or not, are expressly reserved, including any rights or defenses under the policy or at law raised in our previous letters addressing this claim.

    If our understanding of the facts of this claim or the cause of this loss is incorrect, please advise us as soon as possible. If VWE obtains additional evidence which we do not currently have that may change our view of coverage, please provide it to us as soon as possible. If you believe that this claim has been wrongfully denied or rejected, and if appropriate under applicable law, you may have this matter reviewed by the California Department of Insurance, Claims Services Bureau, 11th Floor, 300 South Spring Street, Los Angeles, California 90013.

Yours faithfully

*[signature]*

Graham Justice
Senior Claims Adjuster
RSA

cc    Marty Peterson, VWE (mpeterson@vintagewineestates.com)

      Joanne Gillespie, 3D Marine (Miami@3DMarine.com)

      Simon Mauduit, Arthur J. Gallagher (Simon.Mauduit@ajg.com)

      Michael McGrade, Arthur J. Gallagher (Michael.McGrade@ajg.com)