1

2

3

4                    UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7    KUNDE ENTERPRISES, INC.,                Case No.  19-cv-06636-JSW

8                    Plaintiff,
                                             **ORDER RESOLVING CROSS-**
9         v.                                 **MOTIONS FOR SUMMARY**
                                             **JUDGMENT**
10   NATIONAL SURETY CORPORATION,
                                             Re: Dkt. Nos. 64, 70
                     Defendant.
11

12

13         Now before the Court for consideration are the cross-motions for summary judgment filed

14   by Plaintiff Kunde Enterprises, Inc. ("Kunde") and National Surety Corporation ("National

15   Surety" or "Defendant").  The Court has reviewed the parties' papers, relevant legal authority, and

16   the record in the case, and it finds this matter suitable for disposition without oral argument.  *See*

17   N.D. Civ. L.R. 7-1(b).  For the following reasons, the Court GRANTS, in part, and DENIES, in

18   part, Kunde's motion and DENIES National Surety's cross-motion.

19                              **BACKGROUND**

20   **A.    Factual and Procedural Background.**

21         Kunde brings this action for declaratory relief, breach of contract, and good faith and fair

22   dealing against National Surety and seeks coverage for losses to smoke-damaged wines arising out

23   of 2017 wildfires in Napa and Sonoma Counties.

24         On August 23, 2019, Kunde filed this action in Sonoma County Superior Court, and

25   National Surety removed the case to federal court on October 16, 2019.  (Dkt. No. 1.)  On

26   February 18, 2022, Kunde filed a motion for summary judgment on its claims for breach of

27   contract and declaratory relief.  (Dkt. No. 64.)  National Surety filed an opposition to Kunde's

28   motion and a cross-motion, which seeks summary judgment on Kunde's claim for breach of

United States District Court
Northern District of California

United States District Court
Northern District of California

1   implied covenant of good faith and fair dealing and the request for punitive damages in addition to

2   the contract and declaratory relief claims.  (Dkt. No. 70.)

3        Kunde is a family operated winery and vineyard in Kenwood, California.  (Joint Statement

4   of Facts ("JSF") ¶ 1.)  Kunde purchased a property insurance policy from National Surety for the

5   period April 1, 2017, through April 1, 2018 (the "Policy").  (*Id.* ¶ 2.)

6        In October 2017, the Nuns Fire in Sonoma County merged with several other fires and

7   encompassed much of the area that included Kunde's property.  (*Id.* ¶ 5; *see also* Dkt. No. 64 -3,

8   Declaration of Zach Long ("Long Decl.") ¶ 5.)  Smoke from the Nuns Fire infiltrated Kunde's

9   vineyard and winemaking facilities.  (JSF ¶ 6.)  As a result, the finished wine from this period

10  "conveyed strong aromas and undesirable tastes" and was unmarketable beyond salvage value.

11  (*Id.*)  This smoke damage to wines is referred to as "smoke taint."

12       The smoke taint affected two groups of Kunde's wines: (1) the "Watch List" wines, and (2)

13  the "Fire Lot" wines.  (*Id.* ¶ 7.)  At the time the wildfires began, Kunde had already harvested or

14  purchased certain grapes, crushed them, and put the resulting must into vats to be processed into

15  wine.  (Long Decl. ¶ 6; *see also* JSF ¶ 7.)  The fifteen (15) lots of finished wine made from these

16  grapes are the Watch List wines. [1]  (*Id.*)  Testing of the finished Watch List wines showed smoke

17  taint.  (Long Decl. ¶ 6; *see also* JSF ¶ 7.)

18       Kunde also made wine from grapes harvested between October 20, 2017, and October 30,

19  2017.  (JSF ¶ 7.)  A week after the wildfires began, Kunde sent four samples of grapes to ETS

20  Laboratories ("ETS") for testing.  (Long Decl. ¶ 7.)  ETS tested only two of the four samples—

21  4CS1 and 3CS26—because of the high volume of testing requests at the time.  (*Id.*)  ETS found

22  significant levels of smoke taint compounds in the samples from block 3CS26.  (*Id.* ¶ 8.)  Kunde

23  did not harvest these grapes and allowed them to rot on the vine.  (*Id.*)  ETS found insignificant

24  levels of smoke taint compounds in the sample from block 4CS1, and Kunde harvested the grapes

25  from this block.  (*Id.* ¶¶ 8-9.)  Kunde also harvested grapes from other blocks that were located

26

27  ───────────────

28  [1] A "lot" refers to batch of wine.  (Long Decl. ¶ 6.)  A lot can be made from grapes from a single block, from a mix of several blocks, from a single third-party source, or from a mix of third-party sources.  (*Id.*)

1    farther from the fire.  (*Id*. ¶ 9.)  The grapes from these blocks were not tested.  The harvested

2    grapes from block 4CS1 and the untested blocks were crushed and placed into the vats for

3    fermentation.  (*Id*.)  The thirty-two (32) lots of finished wines made from these grapes are the Fire

4    Lot wines.  (*Id*.)  Testing of the finished Fire Lot wines showed smoke taint.  (*Id*.; *see also* JSF ¶

5    7.)

6            On October 16, 2017, Kunde provided initial notice of loss and claim to National Surety.

7    (JSF ¶ 8; *see also* Dkt. No. 65, Joint Appendix of Exhibits "(JA)", Ex. 12.)  Kunde provided

8    additional information regarding its claimed losses to National Surety over the next year.  (JSF ¶

9    9.)  On October 9, 2018, National Surety sent a letter to Kunde regarding coverage.  (JA, Ex. 4;

10    *see also* JSF ¶ 10.)  National Surety reported that the smoke taint damage to the Fire Lot wines

11    resulted from the grapes' exposure to smoke while they were on the vines prior to harvest and did

12    not occur from exposure to smoke during the wine production process, as Kunde asserted.  (JA,

13    Ex. 4 at ALLIANZ_000004.)  Because the Policy excludes coverage for damage to grapes on the

14    vine, National Surety denied coverage for the Fire Lot wines.  (*Id*.)  On October 22, 2018, Kunde

15    disputed National Surety's denial of coverage for the smoke tainted wines.  (*Id*., Ex. 5 at

16    ALLIANZ_000631; *see also* JSF ¶ 11.)

17            On March 14, 2019, National Surety sent an additional letter to Kunde regarding coverage.

18    (JSF ¶ 12; *see also* JA, Ex. 6.)  Based on additional information and further investigation, National

19    Surety determined the Policy provided some coverage for the smoke tainted Watch List wines,

20    which were made with grapes harvested before the fires began.  (JA, Ex. 6 at ALLIANZ_000027.)

21    National Surety maintained its denial of coverage for the Fire Lot wines based on its belief that the

22    smoke taint damage to the grapes used to make the Fire Lot wines occurred on the vine.  (*Id*.)

23            On August 22, 2018, counsel for Kunde objected to National Surety's coverage position

24    and requested further reconsideration.  (JSF ¶ 13.)  National Surety maintained its coverage

25    position.  (*Id.* ¶ 14.)

26    **B.    Relevant Policy Provisions.**

27            The Policy's Property-Gard Business and Real and Personal Property Coverage Form

28    ("Property Coverage Form") has limits of $35,060,173.  (JA, Ex. 1, at ALLIANZ_000099.)  The

United States District Court
Northern District of California

3

Property Coverage Form "insures all risks of direct physical loss or damage, except as excluded or limited elsewhere in this Coverage Section."  (*Id*. at ALLIANZ_000140.)  The "Property Not Insured" provision states:

> This Coverage Section does not insure any of the following property, unless specifically covered by the Declarations or by endorsement to this Coverage Section:
>
> 1.  Land, water, growing plants and crops outside of buildings, standing timber or outdoor trees, shrubs, lawns…

(*Id*.)

The Property Coverage Form contains an "Exclusions" provision, which provides in relevant part:

> 3. This Coverage section does not insure against loss, damage or expense caused by or resulting from the following.  But if loss or damage from a covered cause of loss results, we will pay for that resulting loss or damage.
>
> […]
>
> c. Shrinkage, evaporation, leakage of contents, change in flavor or texture or finish, decay or other spoilage…

(*Id*. at ALLIANZ_000142.)

The Policy contains a Perishable Stock Coverage Endorsement, which states:

> Section III.L. of the Property-Gard Select – Basic Extensions of Coverage for Wineries – 190092 05 06 is deleted and replaced with the following:
>
> L. Perishable Stock
>
> > 1. The following is added under Paragraph B., Property Insured, as respects covered personal property:
> >
> > **Perishable stock**
> >
> > We will pay for direct physical loss or damage to **perishable stock** caused by or resulting from **spoilage** while at a premises described in the Declarations of this policy.
> >
> > **Spoilage** means the act of damage to or contamination of **perishable stock**.  **Spoilage** of **perishable stock** includes any impurity caused by contact or mixture with a foreign substance.  Foreign substances include wine products which are not meant to be party of the wine recipe or blend.  **Spoilage** does not mean contact or mixture with any **wine products** intended to be part of the wine recipe or blend.

[…]

8. The definition of **perishable stock** in Section VIII.F of the Property Gard Select – Basic Extensions of Coverage for Wineries – 190092 is deleted and replaced with the following:

F.  **Perishable stock** means personal property maintained under the controlled conditions required for its preservation and susceptible to loss or damage if the controlled conditions change.  With respect to coverage provided by this endorsement, **perishable stock** includes **wine products**.

(*Id.* at ALLIANZ_000201-02.)

The Court will address additional facts as necessary in the analysis.

## ANALYSIS

### A.    Legal Standard on Motion for Summary Judgment.

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the [moving party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  On issues where the moving party does not have the burden of proof at trial, the moving party is required only to show that there is an absence of evidence to support the nonmoving party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).  Upon such showing, the court may grant summary judgment "on all or part of the claim."  Fed. R. Civ. P. 56(a)-(b).

The moving party initially bears the burden of proving the absence of a genuine issue of material fact.  *Celotex,* 477 U.S. at 323.  Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case.  *Id*. at 325.  Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial.  *Id.* at 324.  The non-moving party must do more than show there is some "metaphysical doubt" as to the material facts at issue.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  The non-moving party has failed to meet its burden if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Id*. at 587.  The non-moving party is entitled to have all reasonable inferences drawn in its

United States District Court
Northern District of California

5

favor.  *Id*.

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits."  *Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations and internal punctuation marks omitted).  Under this standard, "each party, as a movant for summary judgment, bears the burden of establishing that no genuine dispute of material fact exists and that the movant is entitled to a judgment as a matter of law."  10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2720, 352-353 (4th ed. 2016).  If a genuine dispute of material fact exists, a court must deny both motions.  *Id*. at 353-354.  However, if there is no dispute of material fact and only one party is entitled to judgment as a matter of law, a court may grant summary judgment as to that party only.  *Id*. at 354-355.  The materiality of a fact is determined by whether it might influence the outcome of the case based on the contours of the underlying substantive law.  *Anderson*, 477 U.S. at 248.  Disputes over such facts amount to genuine issues if a reasonable jury could resolve them in favor of the nonmoving party.  *Id*.  In determining whether a jury could reasonably render a verdict in the non-moving party's favor, all justifiable inferences are to be drawn in its favor.  *Id.* at 255.

**B.     Principles Governing the Interpretation of an Insurance Contract.**

Under California law, the interpretation of an insurance policy is a question of law.  *See Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995).  Grants of coverage are to be interpreted broadly, while exclusions are interpreted narrowly and against the insurer.  *Shade Foods, Inc. v. Innovative Products Sales*, 78 Cal. App. 4th 847, 867 (2000).  "The insurer bears the burden of proving ... the applicability of an exclusion ...."  *State Farm Fire & Cas. Co. v. Martin*, 872 F.2d 319, 321 (9th Cir. 1989).  The court must "look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it."  *Waller*, 11 Cal. 4th at 18 (citation omitted).  The plain language of the insurance policy governs its interpretation.  *See Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254, 1264-65 (1992).  A policy provision is ambiguous if it is "capable of two or more constructions, both of which are reasonable."  *Waller*, 11 Cal. 4th at 18.  "Language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract."  *Id*.  If

the language is ambiguous or unclear, "it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." *Bank of the W.*, 2 Cal. 4th at 1264-65.  Courts should "not strain to create an ambiguity where none exists." *Waller*, 11 Cal. 4th at 18-19.

Insurance coverage is "interpreted broadly so as to afford the greatest possible protection to the insured, [whereas]...exclusionary clauses are interpreted narrowly against the insurer." *White v. Western Title Ins.* Co., 40 Cal.3d 870, 881 (1985.)  "[A]n insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003).  "Any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect." *Id.*  Thus, "the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language."  It is not enough that an exclusion be unambiguous; any provision taking away coverage must also be understandable from the standpoint of a layperson." *Id.*; *see also Haynes v. Farmers Ins. Exch.*, 32 Cal. 4th 1198, 1212 (2004) (noting that exclusions are to be "subjected to the closest possible scrutiny and judged from the perspective of an average layperson.").

## C.    Evidentiary Issues.

### 1.    Kunde's objections to National Surety's expert declarations.

Rule 702 of the Federal Rules of Evidence provides that expert opinion evidence is admissible if: (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the relevant principles and methods to the facts of the case.  Fed. R. Evid. 702.

Under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny, a district court's inquiry into admissibility "is a flexible one." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.,* 738 F.3d 960, 969 (9th Cir. 2013) (citation omitted).  In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d

1   558, 565 (9th Cir. 2010) (citation and quotation marks omitted).

2        "[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation

3   and is relevant to the task at hand.'"  *Id.* at 564 (quoting *Daubert,* 509 U.S. at 597).  "Expert

4   opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent

5   inquiry.  And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and

6   experience of the relevant discipline."  *Id.* at 565 (citation and quotation marks omitted).  "Shaky

7   but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to

8   the burden of proof, not exclusion."  *Id.* at 564 (citation omitted).  The judge is "supposed to

9   screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they

10  are impeachable."  *Alaska Rent-A-Car,* 738 F.3d at 969.  Simply put, "[t]he district court is not

11  tasked with deciding whether the expert is right or wrong, just whether his testimony has

12  substance such that it would be helpful to a jury."  *Id.* at 969-70.

13       Kunde objects to the three expert declarations submitted by National Surety on the basis

14  that the opinions are inadmissible and speculative.

15            **a.    Chris Markell.**

16       Markell is an international consultant in enology and viticulture and a winemaker with

17  decades of experience in the areas of vineyard management, wine chemistry, and wine

18  management.  (Dkt. No. 70-12, Declaration of Chris Markell, ¶¶ 1-2.)  Markell's knowledge and

19  experience in these areas is sufficient to qualify him to opine on the smoke damage to Kunde's

20  grapes.  Markell's report was based on conversations with Kunde personnel, review of documents

21  provided by Kunde, and review of the test results from ETS.  These facts and data constitute a

22  sufficient basis for Markell's report.  Markell's opinion is admissible evidence.  Although Markell

23  cannot opine with certainty as to when the smoke damage occurred, that is not necessary for his

24  opinion to be admissible in evidence.   A jury could reasonably infer from Markell's report and

25  National Surety's other evidence that the smoke damage occurred prior to harvest.

26            **b.    Philip Crews.**

27       Crews is a research professor of chemistry at University of California, Santa Cruz.  (Dkt.

28  No. 70-1, Declaration of Philip Crews, ¶ 1.)  Crews has written a peer-reviewed paper on the topic

United States District Court
Northern District of California

of smoke taint in grapes and wine, and he teaches a course on the chemistry of wine.  (*Id*. ¶¶ 3-4.)

Crews' background qualifies him to opine on the smoke taint to Kunde wines as result of the 2017

wildfires.  The conclusions in Crews' report are based on review of the ETS test results, Markell's

report, and information provided by Kunde.  Crews' opinions are admissible given the subject

matter and his knowledge and experience.  His opinions are relevant in that they could help the

factfinder determine when the smoke taint damage to Kunde's grapes occurred and assess the ETS

test results.

### c.     Daniel Jaffe.

Jaffe is a professor of environmental chemistry and atmospheric sciences.  (Dkt. No. 70-9,

Declaration of Daniel Jaffe, ¶ 1.)  Jaffe has expertise in the areas of atmospheric chemistry, ozone

photochemistry, urban and regional smog, and long-range transport of pollutants, and he has

studied the impacts of wildfires on air quality.  (*Id*. ¶¶ 2, 4.)  Using air quality data from the U.S.

EPA Air Quality System, Jaffe prepared an evaluation of the occurrence and distribution of smoke

in the region around the Kunde estate between October 7, 2017, and October 31, 2017.  Based on

his evaluation, Jaffe reports that the smoke and particulate matter concentrations in region around

the Kunde estate were exceptionally high and classified as unhealthy for all between October 8,

2017, and October 18, 2017.  After October 18, 2017, the concentrations dropped substantially.

Based on this data, Jaffe opines that the exposure of grapes or food crops to smoke in this region

occurred predominantly between October 8th and 18th.

Kunde objects to Jaffe's report as speculative because Jaffe does not have any specific

expertise in the impact of smoke on wine grapes or food crops.  Kunde also objects to Jaffe's

reliance on the EPA Air Quality Index as irrelevant because it concerns hazards to public health,

not smoke exposure to grapes or wines.  Although Jaffe does not claim expertise in the impact of

smoke on wine or grapes, his expertise and experience qualify him to opine on the smoke

concentrations in the region around Kunde during the relevant time period.  Moreover, Jaffe's

opinion about the smoke concentrations in the air could help the factfinder determine when the

smoke taint damage to the Fire Lot wines occurred.

The Court OVERRULES Kunde's objections to the Declarations of Markell, Crews, and

1    Jaffe.  These objections are overruled without prejudice and does not preclude Kunde from

2    seeking to exclude the testimony later.

3         **2.     Other evidentiary objections.**

4         Both parties raise numerous evidentiary objections, which they set forth in separate

5    statements at the conclusion of their briefs.  For purposes of this motion only, the Court rules as

6    follows:

7         National Surety's objections to the declarations of Patrick Roney (Dkt. Nos. 64-2, 76-2)

8    and the declarations of Zach Long (Dkt. Nos. 64-3; 76-4) are OVERRULED.  Roney is the CEO

9    and founding partner of Kunde, and Long is Kunde's chief winemaker.  Their testimony regarding

10   Kunde's winemaking process, the events surrounding the wildfires, and subsequent insurance

11   dispute are matters within their first-hand knowledge and is proper opinion testimony under FRE

12   701.

13        National Surety's objections to the declarations of Richard G. Peterson (Dkt. Nos. 64-5;

14   76-3) are OVERRULED.

15        National Surety's objections to the Declaration of Greg Skorheim (Dkt. No. 76-5) are

16   OVERRULED.

17        Kunde's objections to the Crews declaration and report, the Markell declaration and report,

18   and the Jaffe declaration are OVERRULED for the reasons discussed above.  In addition, many of

19   the specific evidentiary objections Kunde lodges against National Surety's experts take issue with

20   the substance of the evidence.  These issues are appropriate for the purposes of argument but are

21   not a basis for excluding evidence.  The Court OVERRULES as MOOT the hearsay objections to

22   the seminar excerpts attached to and referenced in Markell's declaration because it did not rely on

23   those excerpts.

24        **3.     Requests for judicial notice.**

25        Kunde seeks judicial notice of four exhibits in connection with its motion for summary

26   judgment and it combined opposition and reply, which include: (1) excerpts from a CAL FIRE

27   report entitled "2017 Wildfire Activity Statistics; (2) a map entitled "2017 North Bay Wildfire

28   Affected Areas"; (3) a Google maps printout of Kunde's location; and (4) EPA's "Revised Air

United States District Court
Northern District of California

1    Quality Standards for Particle Pollution and Updates to the Air Quality Index ("AQI").  (*See* Dkt.

2    Nos. 66, 77.)  National Surety does not oppose Kunde's requests for judicial notice.

3           The Court GRANTS Kunde's requests for judicial notice.  It takes judicial notice of the

4    CAL FIRE report, the Wildfire map, and the EPA standards because they are public records of an

5    administrative body that are publicly accessibly on the agency websites.  *Daniels-Hall v. Nat'l*

6    *Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010).  The Court also finds judicial notice of the

7    Google maps printout proper as a source whose accuracy regarding locations cannot be reasonably

8    questioned.  *Kalani v. Starbucks Coffee Co.*, 698 F. App'x 883, 886 (9th Cir. 2017).

9           National Surety requests judicial notice of one exhibit in connection with its combined

10   cross-motion for summary judgment and opposition to Kunde's motion for summary judgment.

11   (Dkt. No. 71.)  National Surety seeks judicial notice of a webpage from the Department of

12   Viticulture and Enology at University of California, Davis, which discusses the impact of wildfires

13   on California grapes and wine.  National Surety contends that courts may properly take judicial

14   notice of school and university webpages.  *Daniels-Hall*, 629 F.3d at 998-99.  Kunde opposes

15   National Surety's request on the basis that National Surety offers the webpage for the truth of its

16   contents, which Kunde asserts are reasonably disputed.  The Court agrees with Kunde.

17   Accordingly, the Court GRANTS National Surety's request for judicial notice; however, it takes

18   judicial notice of the website's existence but not the truth of the statements therein.  *Zieger v.*

19   *WellPet LLC*, 304 F. Supp. 3d 837, 845 (N.D. Cal. 2018).

20   **D.    The Cross-Motions for Summary Judgment on Breach of Contract and Declaratory
            Relief.**

21          The parties' cross-move for summary judgment on Kunde's causes of action for breach of

22   contract and declaratory relief.  In an insurance breach of contract case, the initial burden falls on

23   the insured to demonstrate that the occurrence forming the basis of the claim comes within the

24   basic scope of the insurance policy.  *Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1188

25   (1998).  Once an insured has proffered evidence to meet his burden, the insurer then carries the

26   burden to prove that the claim is excluded under a specific provision of the policy.  *Id.; see also*

27   *Garvey v. State Farm Fire & Casualty Co.*, 48 Cal. 3d 395, 407 (1989) (en banc).

28

United States District Court
Northern District of California

1    Here, the Policy "insures all risk of direct physical loss or damage" to covered property,

2  "except as excluded or limited elsewhere in this Coverage Section."  (JSF ¶ 4.)  This language

3  signifies the Policy is an "all risk" policy.  Accordingly, to meet its initial burden, Kunde need

4  only show that the damage occurred as a result of a "direct physical loss" to its property.  *See*

5  *Garvey*, 48 Cal. 3d at 407 ("[U]nder the all-risk first party property policy, because generally 'all-

6  risk of physical loss' is covered, the exclusions become the limitation on loss coverage.").

7    It is undisputed that damage to Kunde's property occurred as a direct result of the

8  wildfires.  Thus, Kunde has met its threshold burden of proving that the damage falls within the

9  basic scope of the Policy.

10    The burden shifts to National Surety to "bring[] itself within a policy's exclusionary

11  clauses" which are to be "strictly construed."  *HS Services, Inc. v. Nationwide Mut. Ins. Co.*, 109

12  F.3d 642, 645 (9th Cir. 1997).  Coverage will exist unless National Surety points to an exclusion

13  that "conspicuously, plainly and clearly apprises the insured" that smoke taint damage will not be

14  covered.  *MacKinnon*, 31 Cal. 4th at 649.  National Surety argues two exclusions preclude

15  coverage for the damage to Kunde's wines: (1) a "spoilage exclusion," which would apply to the

16  damage to both the Watch List and Fire Lot wines; and (2) a "growing crops" exclusion, which

17  would bar coverage for the Fire Lot wines.

18    **1.    The spoilage exclusion does not bar coverage for Kunde's losses.**

19    The "spoilage exclusion" in the Policy excludes "loss, damage or expense caused by or

20  resulting from…shrinkage, evaporation, leakage of contents, change in flavor or texture or finish,

21  decay or other spoilage."  (JA, Ex. 1 at ALLIANZ_000142.)  The question is whether the

22  "spoilage exclusion" unambiguously excludes smoke taint damage caused by the wildfires from

23  coverage.

24    National Surety contends it is undisputed that the wildfire smoke caused undesirable tastes

25  and aromas in Kunde's wines.  It further argues there is no evidence that smoke taint is not a

26  "change in flavor."  Thus, National Surety asserts that the exclusion for "change in flavor" in the

27  spoilage exclusion, read literally, excludes coverage for the smoke taint to Kunde's wines.  Even

28  though fire is a covered cause of loss, National Surety argues that the "change in flavor" exclusion

1   clearly and explicitly excludes coverage for the smoke taint damage to Kunde's wines.

2       Kunde disagrees. Kunde argues that damage from the wildfire is not properly

3   characterized as a "spoilage" loss. Kunde uses the doctrine of *noscitur a sociis* to argue that when

4   read in context the term "change in flavor" applies to "normal variances in winemaking," not

5   wildfire damage. (Mot. at 11.) The principle of *noscitur a sociis*—a word is known by the

6   company it keeps—operates to "avoid ascribing to one word a meaning so broad that it is

7   inconsistent with its accompanying words…" *Yates v. United States*, 574 U.S. 528, 543 (2015)

8   (internal citation and quotation marks omitted). National Surety contends that *noscitur a sociis* is

9   inapplicable here because "change in flavor" is a clear and unambiguous term. *See Schenkel &*

10  *Shultz, Inc. v. Homestead Ins. Co.*, 119 F.3d 548, 551 (7th Cir. 1997) ("[T]he doctrine may not be

11  used to create uncertainty in an otherwise unambiguous term.").

12      The Court agrees with Kunde that the term "change in flavor" in the spoilage exclusion is

13  ambiguous.[2] The terms surrounding "change in flavor," such as shrinkage, evaporation, or

14  leakage, suggest losses that happen in the normal course of making wine. Similarly, surrounding

15  terms such as decay and evaporation seem to be directed toward age-related deterioration. Thus,

16  the "change in flavor" exclusion could reasonably be interpreted to address normal variances in

17  the winemaking process and spoilage that occurs with the passage of time; it does not

18  conspicuously apply to spoilage that occurs as the result of an extreme chance event such as a

19  wildfire.

20      Other provisions in the Policy-suggest that the spoilage exclusion can reasonably be read

21  as limited to natural variances in the winemaking process. For example, Kunde argues that the

22  definition of "foreign substances" in the Perishable Stock Coverage Form, which expressly

23  includes "wine products not meant to be part of the wine recipe or blend" provides further support

24  for limiting the spoilage exclusion to normal variances in the winemaking process. (*See* JA, Ex. 1

25  at ALLIANZ_000201.) National Surety disagrees, arguing that the definition does not limit

26  foreign substances to only wine products. That is true, but it seems unlikely that a layperson

27

28

---

[2] Neither party cites any case law discussing the "change in flavor" exclusion.

United States District Court
Northern District of California

reading this provision would consider wildfire smoke to be the sort of foreign substance contemplated by the provision particularly given the provision's explicit mention of and focus on wine products.  Thus, the Perishable Stock Coverage Form supports Kunde's assertion that, reasonably interpreted, the "change in flavor" exclusion would likely apply only to normal variances in winemaking.

The Court concludes that the "change in flavor" exclusion is ambiguous, and Kunde's interpretation of the provision as limited to normal variances in winemaking is reasonable. Because the Court cannot say that the exclusion plainly and clearly excludes smoke taint damage from wildfires, it must resolve the ambiguity in favor of coverage.  *See Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 667 (1995).  National Surety may not exclude coverage based on the "change in flavor" exclusion.

The Court GRANTS Kunde's motion for summary judgment on this basis and DENIES National Surety's motion for summary judgment on this basis.

> **2.      Fact issues remain regarding the applicability of the growing crops exclusion.**

In addition to the spoilage exclusion, National Surety contends that another provision—the "growing crops" exclusion—independently excludes coverage for the Fire Lot wines.  (*See* JA, Ex. 1, at ALLIANZ_000140.)  National Surety argues that there is no genuine dispute that the smoke taint to the Fire Lot wines occurred while the grapes were on the vine, and thus, this exclusion bars coverage for the damage to the Fire Lot wines.  Kunde argues the opposite—that damage to the Fire Lot wines undisputedly occurred after the grapes were harvested and while the grapes were being processed at Kunde's winemaking facilities as with the Watch List wines.

Because Kunde has met its initial burden to show that the smoke taint damage to the Fire Lot wines is an event within the scope of the basic coverage of the "all risk" policy, National Surety bears the burden to show an exclusion applies.  For the growing crops exclusion to apply, National Surety must show that the damage to the Fire Lot wines occurred while the grapes were on the vine rather than after harvest.

> **a.      Evidence related to smoke taint damage to the Fire Lot grapes.**

A week after the wildfires began, Kunde sent samples of grapes from four blocks to ETS

for testing.  (Long Decl. ¶ 7.)  Because of the high volume of testing requests at the time, ETS tested only two of the grape samples: grapes from block 3CS26 and grapes from block 4CS1.  (*Id.*) ETS found significant levels of smoke taint compounds in the sample from block 3CS26, so Kunde allowed these grapes to rot on the vine.  (*Id.* ¶ 8.)  On the other hand, ETS found insignificant levels of smoke taint compounds in the sample from block 4CS1, and Kunde harvested the grapes from this block.  (*Id.* ¶¶ 8-9.)  Kunde also harvested grapes from other blocks, which were located farther from the wildfire than blocks 4CS1 and 3CS26.  The additional blocks of grapes were never tested.  The harvested grapes from block 4CS1 and the untested blocks were crushed and placed into the vats for fermentation.  (*Id.* ¶ 9.)  When finished, the thirty-two lots of wine produced from these grapes were tested and confirmed as smoke tainted.  (*Id.* ¶ 9.)  Based on this evidence, Kunde asserts that there is no dispute that the grapes used to make the Fire Lot wines were not smoke tainted at the time of harvest.  Kunde argues that the smoke taint must have occurred after harvest during the winemaking process because of the smoke that infiltrated Kunde's winemaking facilities.

National Surety proffers evidence that the smoke taint occurred to Fire Lot grapes while the grapes were on the vine, thereby triggering the growing crops exclusion.  An air quality analysis of the region around Kunde estates shows the smoke and particulate matter concentrations were "exceptionally high" between October 8, 2017, and October 18, 2017, and would have caused "significant smoke exposure" to crops during this period.  (Jaffe Decl., Ex. B at 3.)  After October 18, 2017, the particulate matter and smoke concentrations dropped considerably, and the air quality was classified as "good-moderate."  (*Id.*)  Based on this evidence, National Surety contends that the smoke taint to the Fire Lot wines occurred between October 8 and October 18, during which time the grapes were still on the vine; smoke exposure outside of that period would have been insignificant.[3]

Additionally, National Surety's experts opine that smoke taint occurs in wines due to the presence of compounds called phenols.  *See* Kunde_000271.  Two types of phenols exist—"free"

---

[3] Kunde harvested the blocks used to make the Fire Lot wines between October 20, 2017, and 30, 2017.  (Dkt. No. 76-4, Suppl. Long Decl. ¶ 5.)

United States District Court
Northern District of California

phenols and "bound" phenols. *Id.* When grapes on the vine are exposed to smoke, a reaction occurs inside the grape between the volatile phenols and the grape sugars. KUNDE_0000272. The reaction leads to new phenols called "bound phenols," which are stored inside the grapes and which are released in future winemaking. *Id.* 273. The tests performed by ETS measured the "free" phenols in the grapes, but the tests did not measure the "bound" form of smoke taint compounds. Accordingly, National Surety contends that the ETS testing did not offer a complete assessment of the presence of smoke taint in the grape samples.

b.      **Analysis.**

The Court concludes that National Surety presents sufficient evidence to lead a reasonable factfinder to conclude that the smoke taint occurred while the grapes were on the vines. National Surety's experts opine that smoke taint occurs through exposure to fresh, heavy smoke. National Surety also presents evidence that fresh, heavy smoke was concentrated around Kunde estates while the Fire Lot grapes were still on the vine and that the air quality and smoke concentrations were significantly improved by the time the Fire Lot grapes were harvested and in production. Finally, National Surety presents evidence that multiple types of phenols exist, and that no Fire Lot grapes were tested for the presence "bound" phenols. Thus, it may be reasonably inferred from National Surety's circumstantial evidence that smoke damage occurred on the vine. National Surety has presented sufficient evidence to create a genuine dispute about a material issue of fact.

Kunde criticizes the circumstantial nature of National Surety's evidence. In particular, Kunde criticizes National Surety's lack of test results affirmatively showing that the grapes were damaged on the vine. However, circumstantial evidence can be sufficient to create a genuine dispute of material fact. It is possible that a jury could conclude from National Surety's evidence that smoke taint damage to the Fire Lot grapes occurred on the vine, and thus should be excluded from coverage by the growing crops exclusion. [4]

While National Surety's proffered evidence is enough to preclude Kunde from obtaining

---

[4] It is undisputed that several blocks of the grapes used to produce the Fire Lots wines were never tested by Kunde or National Surety. Thus, neither party can present smoke taint test results for these grapes.

United States District Court
Northern District of California

summary judgment on this issue, it is not enough to permit the Court to grant summary judgment in National Surety's favor.  Kunde has presented evidence that some grapes tested by ETS had insignificant levels of smoke taint before harvest.  Kunde also presents evidence in the form of a declaration from its chief winemaker rebutting National Surety's assertion that the smoke had dissipated by the time the Fire Lot wines were in production.  It is clear from the record that there is scientific uncertainty regarding how and when smoke taint occurs, which further underscores the unresolved factual issues and impropriety of summary judgment on this issue.  The Court finds that there is a material issue of fact regarding whether smoke taint to the Fire Lot wines occurred on the vine or after harvest, and thus, a dispute remains regarding the applicability of the growing crops exclusion.

### c.   The doctrine of efficient proximate cause does not apply.

Kunde also argues that even if National Surety can prove that the damage to the Fire Lot wines occurred on the vine, it cannot prove that on-the-vine damage, and not any subsequent post-harvest smoke exposure in Kunde's facilities, was the efficient proximate cause of the smoke taint to the finished Fire Lot wines.

Kunde's reliance on the doctrine of efficient proximate cause in this situation is misplaced. The "efficient proximate cause" of a loss is the "predominant" or "most important" cause of a loss. Under the efficient proximate cause doctrine, "'[w]hen a loss is caused by a combination of a covered and specifically excluded risks, the loss is covered if the covered risk was the efficient proximate cause of the loss,' but 'the loss is not covered if the risk was only a remote cause of the loss, or the excluded risk was the efficient proximate, or predominate, cause. *De Bruyn v. Superior Court*, 158 Cal. App. 1213,1216 (2008) (quoting *Julian v. Hartford Underwriters Ins. Co.*, 35 Cal.4th 747, 750 (2005).  That is, the "doctrine applies only when there are two or more distinct perils that cause a loss.  In other words, the perils must be such that 'they *could* each, *under some circumstances*, have occurred independently of the other and caused damage.'" *De Bruyn*, 158 Cal. App. 4th at 1223 (quoting *Finn v. Cont'l Ins. Co.*, 218 Cal. App. 3d 69, 72 (1990)) (emphasis in original).  "When the damage is not caused by two distinct causes, but rather by a 'single cause, albeit one susceptible to various characterizations,' the efficient proximate cause

17

1    analysis has no application." *Pieper v. Com. Underwriters Ins. Co.*, 59 Cal. App. 4th 1008, 1019

2    (1997) (quoting *Chadwick v. Fire Ins. Exchange*, 17 Cal. App. 4th 1112, 1117 (1993).

3         Here, it is undisputed that smoke from the wildfires caused the damage.  Regardless of

4    whether the smoke damage occurred on the vine or after harvest, there is only one cause—smoke

5    from the wildfires.  Because the damage was due to one cause, Kunde's invocation of the efficient

6    proximate case doctrine in this situation is inappropriate.

7         Because factual issues remain that cannot be resolved on this record and should be decided

8    by a jury, the Court DENIES Kunde's and National Surety's motions for summary judgment on

9    the breach of contract claim and declaratory relief claims with regard to the application of the

10   growing crops exclusion.

11   **E.     National Surety's Motion for Summary Judgment on Breach of the Covenant of
              Good Faith and Fair Dealing.**

12

13        National Surety also moves to dismiss Kunde's cause of action for breach of the implied

14   covenant of good faith and fair dealing.  Under California law, a breach of the implied covenant of

15   good faith and fair dealing in the insurance context has two elements: "(1) benefits due under the

16   policy must have been withheld and (2) the reason for withholding benefits must have been

17   unreasonable or without proper cause." *Love v. Fire Ins. Exchange,* 221 Cal.App.3d 1136,

18   1151(1990).  "The test for determining whether an insurer is liable for breach of the implied

19   covenant turns on whether the insurer's alleged refusal or delay was unreasonable." *Nationwide*

20   *Mut. Ins. Co. v. Ryan,* 36 F.Supp.3d 930, 941 (N.D. Cal. 2014) (citing *Chateau Chamberay*

21   *Homeowners v. Associated Int'l Ins. Co.,* 90 Cal.App.4th 335, 346 (2001)).  "[T]he precise nature

22   and extent of the duty imposed by [the] implied promise will depend on the contractual purposes,

23   and therefore if there is no potential for coverage under the policy, a claim for bad faith cannot be

24   brought." *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1158 (9th Cir. 2002) (internal

25   citation and quotation marks omitted).

26        Here, National Surety argues this claim should be dismissed because it has paid Kunde all

27   insurance benefits owed under the Policy.  However, the Court has denied National Surety's

28   motion for summary judgment on Kunde's breach of contract and declaratory relief claims.  Thus,

United States District Court
Northern District of California

18

1   a lack of breach of contract does not provide a basis for granting summary judgment in favor of

2   National Surety on this claim. [5]

3          National Surety argues that it is nevertheless entitled to summary judgment on the bad

4   faith claim because the denial of coverage was reasonable or based on a genuine dispute as to

5   liability under the Policy. "The genuine issue rule in the context of bad faith claims allows a

6   district court to grant summary judgment when it is undisputed or indisputable that the basis for

7   the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's

8   version of the facts there is a genuine issue as to the insurer's liability under California law."

9   *Amadeo*, 290 F.3d at 1161 (citing *Safeco Ins. Co. of Am. v. Guyton,* 692 F.2d 551, 557 (9th

10  Cir.1982)). The insurer is entitled to judgment as a matter of law in such a case because a bad

11  faith claim can succeed only if the insurer's conduct is unreasonable. *Id.* 1161-62. However, "an

12  insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most

13  favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably." *Id.* at 1162

14  (internal citation omitted).

15         Here, Kunde asserts the record shows that National Surety did not conduct a good faith

16  investigation because it did not test Kunde's grapes and delayed in beginning its investigation into

17  the damage to Kunde's wines. (Dkt. No. 76-4, Suppl. Roney Decl. ¶ 4.) Kunde also asserts that

18  National Surety unreasonably delayed in providing the coverage decision. (*Id.* ¶ 7.)

19         There is sufficient evidence in the record from which a jury could conclude that National

20  Surety acted unreasonably and denied Kunde's claim in bad faith. *See Nasiri v. Allstate Indem.*

21  *Co.*, 41 F. App'x 76, 79 (9th Cir. 2002) (unreasonable delay in paying a claim can give rise to bad

22  faith). Thus, the Court cannot conclude as a matter of law that National Surety acted reasonably in

23  denying coverage, and it DENIES National Surety's motion for summary judgment on Kunde's

24  claim for breach of implied good faith and fair dealing. [6]

25

26  _____

[5] Kunde did not move for summary judgment on this claim.

27  [6] National Surety attempts to rebut Kunde's showing on reply with evidence regarding the
    purported delay in providing its coverage decision. (*See* Dkt. No. 80-1 Decl. of Conrad Knoten.)

28  However, this evidence was submitted for the first time on reply and cannot be properly
    considered. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).

19

United States District Court
Northern District of California

**F.      National Surety's Motion for Summary Judgment on the Punitive Damages Request.**

National Surety contends it is entitled to summary judgment on Kunde's request for punitive damages because Kunde has not shown that National Surety's conduct amounted to malice, oppression, or fraud as required by California law.

Punitive damages are available "if in addition to proving a breach of the implied covenant of good faith and fair dealing proximately causing actual damages, the insured proves by clear and convincing evidence that the insurance company itself engaged in conduct that is oppressive, fraudulent, or malicious." *Amadeo*, 290 F.3d at 1164 (9th Cir. 2002) (quoting *PPG Indus. v. Transamerica Ins. Co.*, 20 Cal.4th 310, 318 (1999). "[A] plaintiff may meet the state of mind requirement for an award of punitive damages by showing that the insurer's bad faith was 'part of a conscious course of conduct, firmly grounded in established company policy.'" *Id*. (quoting *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal.3d 809, 819 (1979). "Determinations related to assessment of punitive damages have traditionally been left to the discretion of the jury." *Id*.

The question of whether National Surety acted with malice, oppression, or fraud depends at least in part on whether National Surety failed to pay benefits required under the Policy and whether it acted in bad faith in refusing to provide coverage. Triable issues remain as to whether National Surety acted in bad faith and is liable for breach of the implied covenant of good faith and fair dealing. Thus, the Court finds that summary judgment on Plaintiff's request for punitive damages is inappropriate. The question of whether punitive damages are warranted is left to the jury. The Court DENIES National Surety's motion on this basis.

//

//

//

//

//

//

//

//

1

## CONCLUSION

For the foregoing reasons, the Court GRANTS, in part, and DENIES, in part, Kunde's motion for summary judgment, and the Court DENIES National Surety's motion for summary judgment.

The parties are encouraged to reevaluate settlement in light of this Court's Order.  The parties shall submit a joint status report to the Court within sixty (60) days updating the Court on the status of mediation and proposing deadlines for the remainder of the case, including pretrial and trial dates, as needed.

**IT IS SO ORDERED.**

Dated: June 21, 2022

_____
JEFFREY S. WHITE
United States District Judge